FILED
FEB 2 0 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Criminal No. 14-30033-DRH ) |
| GEMMA TZEN, | ) ) Title 18 ) United States Code, Section 1349 |
| Defendant. | ) ) |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### I. Introduction

1. Beginning on or about September 10, 2010, and continuing until on or about January 13, 2011, in the Illinois Counties of St. Clair, Madison, Clark, Franklin, Jasper, Massac, and Saline, within the Southern District of Illinois and elsewhere, **GEMMA TZEN,** defendant herein, conspired with others known and unknown to the Grand Jury to conduct a telemarketing timeshare resale scheme targeting timeshare owners throughout the United States, Canada and other countries.

2. These conspirators, including **GEMMA TZEN**, falsely represented that they had found buyers for the consumers' timeshare interests and solicited fees of up to several thousand dollars from each consumer in purported pre-paid closing costs and related expenses. The promised sales did not occur, closings were never actually scheduled, and the conspirators did not successfully sell any consumer's timeshare interest. Instead, the conspirators simply

pocketed the fees, with a substantial portion going to individual telemarketers like **GEMMA TZEN**. The balance was kept by the owner of the company.

3.     Between December 5, 2007, and approximately July 13, 2011, the conspirators collected approximately $6 million and victimized thousands of consumers throughout the United States, Canada and other countries. No fewer than eight (8) victims were located within the Southern District of Illinois, representing seven of the district's 38 counties.

## II.     The Scheme

4.     The conspiracy was conducted primarily out of office space located at 1650 Sand Lake Road, Suite 200, Orlando, Florida. It later moved to 7550 Futures Drive, Suite 207, Orlando, Florida. Throughout its existence, the conspiracy operated under the following corporate entities, all of which were registered in the State of Florida as limited liability companies:

A.     <u>National Solutions LLC</u> ("National Solutions"), which also did business as Blue Scape Timeshares International, Country Wide Timeshares, Countrywide Timesharesales MA, Landmark Timeshares, Propertys Direct, Quicksale Propertys, Sun Property Networks, Sun Property's, Universal Propertys, and VIM Timeshares. National Solutions used a mail drop at 11310 S. Orange Blossom Trail, Orlando, Florida, as its registered address.

B.     <u>Landmark Marketing LLC</u> ("Landmark Marketing"), which also did business as Blue Scape Timeshares, Country Wide Timeshares International, Propertys DRK, Quick Sale Advisers, Quick Sale International, and University Propertys International. Landmark Marketing used a mail drop at 2223 SW 13th Avenue, Miami, Florida, as its registered address.

C.     <u>Red Solutions LLC</u> ("Red Solutions"), which also did business as City Resorts and Resort Advisors.

2

  D. <u>Enterprise America, LLC</u> ("Enterprise America"), which also did business as American Timeshares, Exit Week, and Resort Advisors International, and which used a mail drop at 11310 S. Orange Blossom Trail, Suite 156, Orlando, Florida, as its registered address.

  E. <u>Investments Group of Florida, LLC</u> ("Investments Group"), which also did business as Resort Advisors AM.

  F. <u>MultiGlobe LLC</u> ("MultiGlobe"), which also did business as Universal Propertys and which used a mail drop at 1750 Sand Lake Road, Orlando, Florida, as its registered address.

  5. Using these business fronts, collectively referred to as "National Solutions," **TZEN** and other conspirators engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest.[1]

  6. **TZEN** and other conspirators would contact consumers through unsolicited telemarketing calls, typically targeting consumers whose timeshare properties had been listed for sale with other timeshare resale companies. In contacting these consumers, **TZEN** and other conspirators often already had information about the consumers' timeshare properties, such as the properties' names and locations, which they would use in their conversations with timeshare owners to foster the illusion that they were calling on behalf of a legitimate company.

  7. **TZEN** and other conspirators would begin a typical telemarketing call by representing that they had a buyer for the consumer's timeshare property. In many instances,

---

[1] As used in this indictment, "timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time. What constitutes a "timeshare" depends upon the law of the state in which the real estate is located.

conspirators would tell the consumer that the purported buyer was willing to pay an amount of money that was at or near the consumer's asking price.

8.  After confirming that the consumer was interested in proceeding with the sale, **TZEN** and other conspirators would then explain that the consumer had to pay an upfront fee for the sale to proceed. In some instances, consumers were told that this fee was required as an "earnest money deposit" to ensure that the consumer committed to sell the timeshare property. In other instances, **TZEN** and other conspirators represented that this fee was required to pay for various sale-related expenses, such as closing costs, document processing fees, or title search fees. Regardless of the reason given, **TZEN** and other conspirators reassured consumers that the fee would be refunded at closing.

9.  National Solutions telemarketers elicited fees that ranged between $1,000 and $3,150. They ordinarily solicited a money order or a cashier's check, to be mailed to the company by overnight delivery. At times, National Solutions also accepted payment by check draft and credit card.

10. To further deceive consumers into believing that the transactions were legitimate, **TZEN** and other conspirators often represented or implied that the sales transaction would be reviewed and approved by the Federal Trade Commission. Any implication that National Solutions complied with laws administered by the Federal Trade Commission was wholly false, as the practices of National Solutions telemarketers constituted massive violations of the Telemarketing Sales Rule, Title 16, Code of Federal Regulations, Part 310, and of the Federal Trade Commission Act, Title 15, United States Code, Sections 41 *et seq.*

11. Believing that National Solutions had a buyer for their timeshare property and that the fee would be refunded at closing, many consumers agreed to proceed with the sale. These

consumers were then transferred to, or subsequently received a telephone call from, another National Solutions telemarketer for verification purposes. National Solutions recorded portions of these verification calls. In at least one instance, the telemarketer conducting the verification call represented that she actually worked for the Federal Trade Commission.

12. Conspirators would then mail, email, or fax the consumer a list of "steps" that needed to be completed before the closing could occur. These "steps" related to the payment of the fee and were the same as what many consumers already had been told on the telephone, for example:

1. Get a certified check for the amount of $1,500 made out to BLUE SCAPE PROPERTIES. In Memo put (REF#2873HARV)

2. Fax back a copy of the check to 702-442-5155. ATTN: M.CHANDLER

3. Overnight the check to:
Blue Scape Timeshares
2961 Industrial Road
SUITE#610(CLOSING DEPT)
Las Vegas, NV 89109

4. GO TO THE POST OFFICE GET A *(sic)* OVERNIGHT EXPRESS TRACKING NUMBER FROM THE POST OFFICE.

5. PLEASE CALL ME WITH TRACKING NUMBER TO GET YOU VERIFIED

13. In addition to these "steps," consumers were also sent a contract with identifying information about themselves and their timeshare property.

14. Below the identifying information, the contract stated: "TOTAL COST FOR PROCESSING UNTIL YOUR PROPERTY IS SOLD AND/OR RENTED:" followed by the total amount of the fee. Conspirators described the contract as the "sales agreement" or "seller's

5

document" and instructed consumers to sign and return it immediately. By the time they received this contract, most consumers had already paid the conspirators' fee by overnighting a money order or cashier's check.

15. Contrary to the representations that had been made by **TZEN** and other National Solutions' telemarketers, the contract consumers received did not relate to a pending sale of their timeshare property. Instead, it provided only that conspirators would <u>advertise</u> the consumer's timeshare property for sale or rent. For example, the contract included the following:

> I understand and acknowledge the following:
>
> Blue Scape Timeshares is an advertising company. The property owner pays a one-time, non-recurring advertising fee. Our advertising program pools the advertising resources of our customers to get the exposure needed to sell and/or rent your property. Our company forwards all inquiries and offers on your property directly to you, and allows you to negotiate the sales or rentals of your property without the involvement of any real estate brokers, and without the expense of any commission. Our company is not involved in any negotiation for the sale or rental of your property, but we will assist and guide you in the process to the best of our ability. [...] This advertising agreement can be terminated with a written request (we must receive the request within 7 days of sign up, as your advertising begins within the first 48 hours). [...]

16. Many consumers signed and returned the contract without reading the fine print. Consumers who noticed the advertising language and called the company to complain were told by **TZEN** and other conspirators to ignore the fine print – that it was merely a standardized form contract. These consumers were further reassured that the buyer was ready to proceed and that the closing date already had been set. Relying on these representations, many consumers who were initially skeptical were persuaded to sign and return the contract.

17. After receiving consumers' payments and signed contracts, conspirators often did not contact the consumers again. The promised date for the closing of a consumer's timeshare property typically passed without any further contact from conspirators.

18. When disappointed consumers would call, **TZEN** and other conspirators employed a series of tactics to stall for time. For example, consumers were sometimes not permitted to speak to the telemarketer who handled the initial call and were told that the telemarketer was unavailable, out of the office, or busy helping other customers. Consumers' requests for return phone calls usually went unanswered. When consumers were able to speak to someone, they were put off by a series of lies, all of which were designed to convey the impression that, despite some unforeseen delay, the sale of the consumer's timeshare was still proceeding. Sometimes, the excuse for the delay was that some paperwork still had to be completed or mailed. Other times, it was that there was a problem with the buyer's financing. No matter what the bogus excuse, the purpose was the same: to instill a false sense of hope so that the consumer would be temporarily persuaded not to file a complaint or seek a refund.

19. Eventually, however, the lies would grow thin, and many consumers, realizing that they had been deceived, demanded the return of their money. These complaints usually went unanswered, and consumers' demands for a refund were routinely denied or simply ignored. Because consumers often had paid the upfront fees by money order or cashier's check, instead of by credit card, they usually could not reverse or cancel the transaction and had little recourse to get their money back.

20. The established and highly successful sales pitch that **TZEN** and other conspirators used contained materially false pretenses, representations, and promises, including that (a) there was a buyer willing to pay a specified price for the consumer's timeshare property;

7

(b) the upfront fees were for deed and title searches, maintenance profiles, deed preparation, title transfer costs, or similar expenses; (c) the upfront fees would be refunded to the consumer at closing; and (d) the consumer's transaction was being reviewed and approved by the Federal Trade Commission.

21. The representations made in the sales pitch used by conspirators were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer. The fees were not being used for closing costs, but were being stolen to enrich the conspirators and to pay for continuing expenses associated with the scam.

22. The sales practices of the conspirators were false and misleading. The business fronts used by the conspirators were permeated with fraud in an industry pervaded by deceit.

23. In connection with the transactions described in this Indictment, conspirators engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over victims located in the Southern District of Illinois and elsewhere throughout the United States and Canada.

**COUNT 1**
Conspiracy to Commit Mail and Wire Fraud
18 U.S.C. §1349

24. The previous paragraphs of the indictment are realleged and incorporated herein.

25. Beginning on or about November 2, 2010, and continuing until on or about January 12, 2011, in the Illinois counties of St. Clair, Madison, Clark, Franklin, Jasper, Massac, and Saline, within the Southern District of Illinois and elsewhere,

**GEMMA TZEN,**

defendant herein, together with others both known and unknown to the grand jury, using various business fronts, did knowingly and willfully combine, conspire, confederate and agree among themselves and with each other to commit certain offenses against the United States, as follows:

A. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by the United States Postal Service and by commercial interstate carrier, mail matter to and from residents of the United States, including residents of the Southern District of Illinois, and to and from offices in the State of Florida, in violation of Title 18, United States Code, Section 1341.

B. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, and for the purpose of executing the scheme, and attempting to do so, to knowingly cause to be transmitted by means of wire or radio communication in interstate and foreign commerce, interstate telephone calls, credit card transactions, electronic fund transfers, and signs and signals, to and from offices in the State of Florida, in violation of Title 18, United States Code, Section 1343.

26. In furtherance of and as a foreseeable consequence of the conspiracy, conspirators caused contracts and other documents to be transmitted by U.S. Mail or by interstate commercial carrier to the Southern District of Illinois.

27. In furtherance of and as a foreseeable consequence of the conspiracy, conspirators caused interstate telephone calls to be made to the Southern District of Illinois.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326(1).

A TRUE BILL

███████████████
FOREPERSON

STEPHEN R. WIGGINTON
United States Attorney

MICHAEL J. QUINLEY
Assistant United States Attorney

WILLIAM E. COONAN
Assistant United States Attorney